The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner John A. Hedrick. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. On April 22, 1994 the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date an employment relationship existed between plaintiff and defendant-employer.
3. The Travelers Insurance Company was the workers' compensation insurance carrier on the risk.
4. On April 22, 1994 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. As a result of the accident, plaintiff sustained an injury to her left hand.
5. A letter dated July 8, 1994, marked as Stipulated Exhibit Number Two, is admitted into evidence.
6. A letter dated August 23, 1994, marked as Stipulated Exhibit Number Three, is admitted into evidence.
7. A letter dated July 6, 1994, marked as Stipulated Exhibit Number Four, is admitted into evidence.
8. Seventy-nine pages of plaintiff's medical records, received by the Industrial Commission on January 26, 1996, are admitted into evidence.
9. Defendants' Form 33R, Response to Request that Claim be Assigned for Hearing and one type-written page attached thereto, are admitted into evidence.
10. Two pages of plaintiff's employment records from MoneyTrain, received by the Industrial Commission on March 6, 1996, are admitted into evidence.
11. Plaintiff's 1994 W-2 Wage and Tax Statement from defendant-employer is admitted into evidence.
12. Plaintiff's 1994 Form 1040 EZ Tax Return is admitted into evidence.
13. Six pages of records relating to unemployment compensation received by plaintiff from 1993 through 1995 are admitted into evidence.
14. Two additional pages of plaintiff's medical records from Dr. Zemel are admitted into evidence.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a female, thirty-three years old, who resided in California. Plaintiff attended North Carolina State University, Louisburg College and the Art Institute of Atlanta. Plaintiff's education included the study on graphic art history and set design. Plaintiff was skilled in the use of personal computers and computer assisted graphic design. Plaintiff was right-hand dominant.
2. In 1991 plaintiff began seeking employment in the film industry. She initially worked on a volunteer basis as an intern on the television program Matlock. Matlock later employed plaintiff as an assistant art director, a paid position which she held for approximately nine months. Plaintiff subsequently worked for The Crow as a graphics designer, Radioland Murders as a junior set designer, Young Indiana Jones Chronicles, as a junior art director, Inkwell, and The Twilight Zone. Plaintiff lived in Wilmington, North Carolina while employed by these employers and defendant-employer.
3. Plaintiff earned $600.00 per week while employed byRadioland Murders and Young Indiana Jones Chronicles. While employed by Inkwell, she earned $650.00 per week. During her three years of employment in the film industry, plaintiff utilized her artistic skills including painting, drawing and model construction. Some of her work involved manual labor and the use of hand tools.
4. Plaintiff's work in the film industry was not consistent. Rather, plaintiff was unemployed for various periods between her employment with the several film and television productions. Her periods of unemployment ranged in duration between three weeks and two months. Prior to becoming employed by defendant-employer, plaintiff was unemployed for at least three weeks.
5. Defendant-employer's only business was the production of the film Fall Time. Plaintiff began her employment with defendant-employer in January or February of 1994 as its art director, earning a weekly salary of $600.00. Defendant-employer paid plaintiff twenty dollars per day, six days per week for meals. Defendant-employer also reimbursed plaintiff for fuel and oil expenses incurred during travel to and from work. There is no evidence of record as to amount plaintiff was paid as reimbursement for fuel and oil expenses. Film industry employees customarily receive twenty dollars per day for meals.
6. On April 19, 1994 plaintiff took over the responsibilities of defendant-employer's production designer who unexpectedly left the film production for health reasons. On that date, plaintiff began earning a weekly salary of $1,000.00. Plaintiff continued to receive payment for meals at the same rate she received prior to April 19, 1994. Plaintiff's duties for defendant-employer included supervisory and artistic responsibilities as well as physical work requiring her to use her hands.
7. On April 22, 1994 plaintiff was operating an electric floor buffer when the machine's electrical cord became entangled in the buffing mechanism. The cord's plug was pulled from the wall outlet, propelled across the room, and struck plaintiff's left hand. As a result of the blow, plaintiff sustained a totally displaced fracture of her left fifth metacarpal.
8. On April 25, 1994 Dr. Seidel undertook to repair the fracture by inserting a pin through the head of the metacarpal and into its shaft. The fifth finger was then held in place by aligning it with the fourth finger. Plaintiff's hand was placed in a brace and she was prescribed pain medication.
9. Following the incident on April 22, 1994 plaintiff was out of work for several days during which period she continued to receive her usual salary. When she returned to work for defendant-employer, plaintiff was able to continue performing her managerial and production duties, however, she was unable to perform the manual duties of her position. Plaintiff continued working in this limited capacity until the completion of the film on May 13, 1994, when her employment was terminated. Plaintiff continued receiving her full salary through the date of the film's completion. While employed by defendant-employer, plaintiff earned $7,000.00 in salary.
10. On May 25, 1994 the pin was removed from plaintiff's left fifth metacarpal and she was prescribed physical therapy. Defendants paid plaintiff temporary total disability compensation from May 14, 1994 through June 27, 1994.
11. On June 27, 1994 plaintiff was evaluated by a physician in Los Angeles, California. Plaintiff's left hand was painful and her fingers were stiff. Plaintiff was prescribed additional physical therapy and restricted to one-handed work. On the same date, plaintiff was offered employment with Southern Stars Studios, Incorporated in Mobile, Alabama. Plaintiff refused this offer of employment due to her physical restrictions, her desire to participate in the prescribed physical therapy and her need for additional treatment. Plaintiff's refusal of the June 27, 1994 offer of employment was justified.
12. Despite her regular participation in physical therapy and performance of home exercises, movement of her left fifth finger was restricted and she developed contracture of the PIP and MP joints. On August 24, 1994 plaintiff presented to the Raleigh Hand Center where she was examined by Dr. Edwards. Following his examination, Dr. Edwards scheduled plaintiff for surgery.
13. The scheduled surgery was postponed after plaintiff aggravated her fifth metacarpal injury by striking the finger against a water hose while washing a dog. On October 18, 1994 Dr. Edwards performed surgery on plaintiff's left fifth finger which was intended to increase the finger's flexion. Defendants paid plaintiff temporary total disability compensation from October 18, 1994 through December 27, 1994.
14. Following surgery plaintiff resumed her tri-weekly physical therapy sessions. Plaintiff was excused from all work through December 14, 1994. On that date she was released to light duty work, with no left hand lifting of weight greater than ten pounds or gripping greater than fifteen pounds.
15. In early 1995, plaintiff returned to California and sought employment in the film industry or as a graphic designer. Although plaintiff was initially unable to obtain film industry employment, she did accept a small project as a free-lance graphic designer. The project was not profitable. There is no evidence of record tending to show value of the services plaintiff provided to the project.
16. From April 20, 1995 through June 10, 1995, plaintiff was employed as a production assistant for the film Money Train. Plaintiff was employed by Money Train for fifty-two days during which time she earned wages totaling $1,808.07, or $243.39 per week. Plaintiff received meal allowances totaling $120.00 per week. Plaintiff's average weekly wage while employed by MoneyTrain was $363.39.
17. Plaintiff later worked on an interactive CD ROM project that was being produced for entertainer Michael Jackson. Plaintiff was hired to perform this work by her boyfriend who was the producer of the project. Plaintiff worked on this project for two weeks, earning $900.00 per week. Plaintiff has not worked for any employer or earned any wages since the Michael Jackson project.
18. On May 23, 1995 plaintiff presented herself for an evaluation by Dr. Kuschner. On that date, plaintiff continued to experience difficulty with her left hand, including a flexion deformity and limited range of motion in her little finger.
19. On October 24, 1995 Dr. Zemel, plaintiff's new treating physician, performed surgery on plaintiff's left little finger. Following surgery, plaintiff was again prescribed physical therapy. Dr. Zemel excused plaintiff from work through February 17, 1996.
20. Beginning October 24, 1995, defendants began paying plaintiff temporary total disability compensation at the rate of $335.35 per week for seven weeks.
21. Plaintiff's injury of April 22, 1994 has not reached maximum medical improvement.
22. Determining plaintiff's average weekly wage by dividing her earnings from defendant-employer by the number of weeks she was so employed results in unfairness to defendants. Plaintiff's employment with defendant was relatively short, spanning approximately three months. During the last month of her employment with defendant-employer, plaintiff's salary was sixty-six percent higher than the salary she earned for the first two months. The primary reason for plaintiff's receipt of the higher salary was the unexpected departure of defendant-employer's production designer. In addition, plaintiff typically experienced periods of unemployment between film and television productions.
23. Due to the uniqueness of plaintiff's employment and her individual skills, there was no employee of the same grade and character to whom plaintiff could be compared to determine her average weekly wage.
24. The fairest method for determining plaintiff's average weekly wage is to consider the wages plaintiff earned from defendant, the wages she earned from previous employers in the film industry and her occasional unemployment. Plaintiff earned $600.00 per week while employed by Radioland Murders and YoungIndiana Jones Chronicles. While employed by Inkwell, she earned $650.00 per week. When she began her employment with defendant-employer her weekly salary was $600.00. Plaintiff received a weekly meal allowances of $120.00 while working for each of these employers.
25. Considering the wages plaintiff earned from defendant-employer, prior employers, including meal allowances, and her periodic unemployment, plaintiff's average weekly wage was $600.00.
26. On April 20, 1995 plaintiff retained the capacity to earn wages at the rate of $363.39 per week. The wages earned by plaintiff as a free-lance graphic designer for the Michael Jackson production were not indicative of her actual wage earning capacity at that time. Plaintiff was employed to perform this work by her boyfriend. The employment lasted only two weeks.
27. As a result of her injury on April 22, 1994, plaintiff was incapable of earning wages from defendant-employer or any other employer from May 14, 1994 through April 19, 1995. Plaintiff was rendered temporarily incapable of earning wages from defendant-employer, or any other employer, after 23 October 1995.
28. As a result of her injury on April 22, 1994, plaintiff's earning capacity was diminished by $236.61 per week from April 20, 1995 through October 23, 1995.
29. After her injury on April 22, 1994, plaintiff received unemployment compensation totaling $7,902.00. Plaintiff received a portion of this unemployment compensation after her employment by Money Train and before her surgery on October 24, 1995.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On April 22, 1994 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As a result of her injury, plaintiff is entitled to payment of temporary total disability compensation at the rate of $400.02 per week from May 14, 1994 through April 19, 1995. N.C. Gen. Stat. § 97-29.
3. As a result of her injury, plaintiff is entitled to payment of temporary total disability compensation at the rate of $400.02 per week from October 24, 1995 and continuing until Order of the Industrial Commission allowing defendants to cease payment of temporary total disability compensation. N.C. Gen. Stat. §97-29.
4. As a result of her injury on April 22, 1994, plaintiff is entitled to payment of temporary partial disability compensation at the rate of $157.75 per week from April 20, 1995 through October 23, 1995. N.C. Gen. Stat. § 97-30.
5. Plaintiff is entitled to payment of all medical expenses incurred as a result of her injury on April 22, 1994 for so long as such examinations, evaluations and treatments tend to effect a cure, give relief or will tend to lessen her period of disability. N.C. Gen. Stat. § 97-2(19); N.C. Gen. Stat. § 97-25.
6. Defendants are entitled to a credit against the compensation due plaintiff in an amount equal to the compensation defendants paid to plaintiff from May 14, 1994 through June 27, 1994, from October 18, 1994 through December 27, 1994 and from October 24, 1995 through the present.
7. Defendants are entitled to a weekly credit against the temporary total disability compensation due plaintiff for the unemployment compensation received by plaintiff during her periods of total disability. N.C. Gen. Stat. § 97-42.1.
8. Defendants are entitled to a weekly credit against the temporary partial disability compensation due to plaintiff for the unemployment compensation she received from 20 April 1995 through October 23, 1995. N.C. Gen. Stat. § 97-42.1.
9. Defendants are entitled to a credit of $315.50 against the temporary partial disability compensation due plaintiff for the wages she earned while working for the Michael Jackson CD ROM project.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $400.02 per week from May 14, 1994 through April 19, 1995. This amount shall be paid in a lump sum, subject to the credits due to defendants in paragraphs 5, 6, 7, and 8 and the attorney's fee approved for plaintiff's attorney in paragraph 9.
2. Defendants shall pay plaintiff temporary total disability compensation at the rate of $400.02 per week from October 24, 1995 and continuing until Order of the Industrial Commission allowing defendants to cease payment of temporary total disability compensation. To the extent that this amount has accrued, it shall be paid in a lump sum, subject to the credits due to defendants in paragraphs 5, 6, 7, and 8 and the attorney's fee approved for plaintiff's attorney in paragraph 9.
3. Defendants shall pay plaintiff temporary partial disability compensation at the rate of $157.75 per week from April 20, 1995 through October 23, 1995. This amount shall be paid in a lump sum, subject to the credits due to defendants in paragraphs 5, 6, 7, and 8 and the attorney's fee approved for plaintiff's attorney in paragraph 9.
4. Defendants shall pay all medical expenses incurred by plaintiff as a result of her injury on April 22, 1994 for so long as such examinations, evaluations and treatments tend to effect a cure, give relief or will tend to lessen her period of disability.
5. Defendants shall receive a credit against the compensation due plaintiff in an amount equal to the compensation defendants paid to plaintiff from May 14, 1994 through June 27, 1994, from October 18, 1994 through December 27, 1994 and from October 24, 1995 through the present.
6. Defendants shall receive a weekly credit against the temporary total disability compensation due plaintiff equal to the amount of unemployment compensation she received during her periods of total disability.
7. Defendants shall receive a weekly credit against the temporary partial disability compensation due plaintiff for the unemployment compensation she received from April 20, 1995 through October 23, 1995.
8. Defendants shall receive a credit of $315.50 against the temporary partial disability compensation due plaintiff for the wages she earned while working for the Michael Jackson CD ROM project.
9. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sum due to plaintiff shall be deducted from that amount and paid directly to plaintiff's attorney. Thereafter, plaintiff's attorney shall receive every fourth compensation check.
FOR THE FULL COMMISSION
 S/ ________________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ________________________ DIANNE C. SELLERS COMMISSIONER
S/ ________________________ LAURA K. MAVRETIC COMMISSIONER
CMV/cnp/mj 9/27/96